## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. XX

**JESSIE CARSON**,

Plaintiff,

v.

**COSTILLA COUNTY BOARD OF COMMISSIONERS**;
**COSTILLA COUNTY SHERIFF'S OFFICE**;
**DANNY SANCHEZ**, in his individual and official capacity;
**ALICIA GAMBOA**, in her individual and official capacity;
**NOBEL HAVENS**, in his individual and official capacity;
**ROBERT CLARK**, in his individual and official capacity;
**UNIDENTIFIED CCSO EMPLOYEES**, in their individual and official capacities;

Defendants.

---

## COMPLAINT

---

Plaintiff Jessie Carson, by and through undersigned counsel, hereby submits this Complaint for violation of his rights under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, and the Americans with Disabilities Act.

# I.    INTRODUCTION

This lawsuit concerns the Costilla County Sheriff's Office's ("CCSO") and its employees' (deputy sheriffs and other staff) complete failure to provide Jessie Carson ("Mr. Carson") with medical care and keep him safe while he was in their custody at the Costilla County Jail ("CCJ").

This lawsuit seeks damages against identified and unidentified CCSO employees in their individual capacities for their deliberate indifference to Mr. Carson's serious medical needs, their failure to maintain safe conditions in the Costilla County Jail, and their failure to protect Mr. Carson, in violation of Mr. Carson's rights as a pretrial detainee under the Fourteenth Amendment to the U.S. Constitution.

This lawsuit seeks declaratory and injunctive relief against identified and unidentified CCSO employees in their official capacities, requiring said employees to adhere to CCSO's policies regarding the treatment of detainees exhibiting signs of a mental health crisis, and to respect the constitutionally mandated medical and confinement rights of detainees.

This lawsuit seeks damages against CCSO and Costilla County for violating Mr. Carson's rights under the Americans with Disabilities Act.

This lawsuit seeks damages and injunctive relief against CCSO– through Sheriff Danny Sanchez and Alicia Gamboa – under §1983 for numerous *Monell* violations,

including establishing customs evincing a deliberate indifference to detainees' serious medical needs, failure to train employees, and failure to supervise employees. The ADA violations also give rise to municipal liability for Costilla County under *Monell* and §1983.

Mr. Carson is a person with diagnosed schizophrenia and bipolar disorder who has lived in Costilla County his entire life. Mr. Carson is unable to work, is dependent on social security and disability benefits, and resides with his disabled mother, Arlene. Because Costilla County is a small community and CCSO deputies have arrested and incarcerated Mr. Carson at CCJ on a number of occasions, CCSO employees are well aware of Mr. Carson's medical disabilities.

CCSO policies make clear that detainees in the midst of a mental health crisis are entitled to immediate emergency health care and CCSO employees must observe and accommodate those detainees while incarcerated. They must take steps to ensure such detainees do not attempt to harm themselves or others.

Despite these policies and prior knowledge of Mr. Carson's mental health needs, deputies arrested Mr. Carson in his own home and forced his mother to press charges before helping him secure medical care. The arresting deputies assured Arlene multiple times that Mr. Carson would receive medical attention.

CCSO employees wholly failed to protect Mr. Carson when they detained him for over a day while he was in the midst of a schizophrenic episode.

CCSO employees failed to screen Mr. Carson upon intake; failed to make records of Mr. Carson's detainment; failed to inquire or seek medication for Mr. Carson; failed to seek medical assistance; failed to isolate Mr. Carson and instead placed him in general population; failed to monitor him throughout the twenty-six hours he was incarcerated; failed to ensure he did not have the means to commit suicide; failed to ensure Mr. Carson could request medical attention; and failed to secure medical care when other inmates alerted them that Mr. Carson had tried to strangle himself with exposed intercom wiring.

Mr. Carson's schizophrenic nightmare only came to an end when deputies finally transported him to the hospital twenty-six hours after he entered the jail, long after he attempted to take his own life.

In spite of CCSO's complete and reckless abdication of its duty, Mr. Carson is alive today, and now brings this lawsuit.

## II.    DISCLAIMER OF INVESTIGATION

Undersigned counsel made significant efforts to identify defendants and investigate the events giving rise to these claims. Counsel interviewed Mr. Carson and his mother and secured many of Mr. Carson's medical records from various facilities.

Counsel also attempted to secure records from CCSO under the Colorado Criminal Justice Records Act. CCSO provided a small fraction of the requested records, including Mr. Carson's arrest record from 2018 and a portion of CCSO's policy manual.

CCSO produced only two records from the days whose events form the basis of this claim: Deputy Havens' police report and Deputy Clark's body cam footage. CCSO failed to produce a single record related to Mr. Carson's incarceration at CCJ. Upon information and belief, CCSO has no other records of Mr. Carson's incarceration from February 24 through February 25 of 2020.

### III. JURISDICTION AND VENUE

1. This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. §§ 1983, 1988, 12132, and 29 U.S.C. § 794a.

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

3. This Court has jurisdiction to declare the rights of the parties and to grant all further relief deemed necessary and proper pursuant to 28 U.S.C. § 2201 and 2202.

4. Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1391 because all events giving rise to the claims occurred in this judicial district.

## IV.    PARTIES

5.      At all times relevant to the subject matter of this litigation, Plaintiff Jessie Carson is and was a resident of Costilla County. Mr. Carson was a pretrial detainee in the Costilla County Jail on February 24 and 25 of 2020.

6.      Defendant Costilla County is a municipality in the state of Colorado with capacity to sue and be sued. Defendant Costilla County Board of Commissioners is the governing body of Costilla County. The Board of Commissioners are responsible for the oversight, supervision, and training of Defendant Costilla County Sheriff's Office and its deputies.

7.      Defendant Costilla County Sheriff's Office ("CCSO") is a department of the Costilla County municipal government. CCSO's Sheriff and Undersheriff are command level supervisors, responsible for the care of all persons in CCSO custody, and oversight of all CCSO employees. The Sheriff has ultimate authority to create, amend, interpret, apply, and enforce CCSO's policies and procedures, and is responsible for ensuring all CCSO employees are properly trained and conduct themselves accordingly.

8.      At all times relevant to the subject matter of this litigation, Defendant Danny Sanchez was a citizen of the United States and a resident of Colorado acting under the color of state law in his capacity as a law enforcement officer with CCSO.

9.      At all times relevant to the subject matter of this litigation, Defendant Alicia Gamboa was a citizen of the United States and a resident of Colorado acting under the color of state law in her capacity as facility administrator for the Costilla County Jail ("CCJ").  Defendant Gamboa's job is to maintain the jail facilities, handle administrative tasks for the jail, and ensure the conditions are safe for inmates.

10.     At all times relevant to the subject matter of this litigation, Defendant Robert Clark was a citizen of the United States and a resident of Colorado acting under the color of state law in his capacity as a law enforcement officer with CCSO.

11.     At all times relevant to the subject matter of this litigation, Defendant Nobel Havens was a citizen of the United States and a resident of Colorado acting under the color of state law in his capacity as a law enforcement officer with CCSO.

12.     Unidentified CCSO employees work in the Costilla County Jail. As part of their duties, unidentified CCSO employees are tasked with making proper records of detainees, their behavior, any medical emergencies or need for medical care, screening detainees for medical problems or needs prior to entering custody of the jail, ensuring the safety of detainees including monitoring their behavior, providing medical care, or soliciting medical care on behalf of detainees, and otherwise adhering the policies set out in the CCSO policy manual.

# V. STATEMENT OF FACTS

## A. Mr. Carson has a long history of mental health disabilities.

13. Mr. Carson, who is fifty-one years old, has lived in Costilla County his entire life.

14. Mr. Carson's father died in 2010. Shortly thereafter, Mr. Carson began experiencing a number of mental health problems and was diagnosed with paranoid schizophrenia and bipolar disorder.

15. When Mr. Carson is in the middle of an episode, he often hallucinates that he is a Christ-like figure or the Antichrist.

16. Mr. Carson has auditory hallucinations; he hears voices telling him he must cut himself. These voices also make Mr. Carson want to kill himself. During an episode, Mr. Carson believes that if he self-harms, the voices will stop.

17. Mr. Carson becomes extremely paranoid and believes there are wiretaps both inside of him and around him that are monitoring him. He believes there are government-level conspiracies against him and that numerous officials are involved in those conspiracies.

18. Mr. Carson also has delusions that events have occurred which, in fact, never happened. He will also speak unendingly and without making any sense.

19. During an episode, Mr. Carson will fluctuate between being completely subsumed by his hallucinations and delusions to having at least some grasp on reality.

20. Consequently, Mr. Carson must take numerous medications daily. He is unable to work and he receives monthly social security and disability benefits.

**B.  The Costilla County Sheriff's Office, and its employees, are well aware of Mr. Carson's mental health disabilities.**

21. Since Mr. Carson was diagnosed as a schizophrenic, he has had numerous encounters with CCSO deputies.

22. Costilla County has a small population and a small sheriff's department; most people in the community know one another and CCSO knows Mr. Carson well.

23. In 2018, CCSO deputies arrested Mr. Carson while he was in the middle of a schizophrenic episode and transported him to the San Luis Valley Health Center (hereafter "SLVH") in Alamosa, Colorado. The transporting deputy informed the staff that he knew Mr. Carson and that Mr. Carson had a history of paranoid schizophrenia.

24. While Mr. Carson was hospitalized, SLVH took continuous precautions against the possibility he would attempt suicide, including a one-to-two full-time behavioral monitors.

25. Through most of 2019, Mr. Carson had little or no interactions with CCSO.

26. But in December of 2020, Mr. Carson's mental health again began to deteriorate, likely as a result of Mr. Carson running out of one of his medications, Depakote.

27. From late January through February 23 of 2020, Mr. Carson had at least four interactions with CCSO deputies resulting from his schizophrenia.

28. These events included an incident at a "James's" house and an incident at Mr. Carson's house where he broke a window.

29. On January 31, 2020, CCSO deputies arrested Mr. Carson and transported him to CCJ, who took custody of him. Deputies transferred Mr. Carson to SLVH because he was having auditory hallucinations and suicidal thoughts. Once again, the hospital took suicide precautions, including providing Mr. Carson with a full-time monitor. Hospital staff observed Mr. Carson speaking to himself and laughing so hard his eyes were tearing up.

30. Mr. Carson had interactions with CCSO deputies on February 22nd and 23rd, which involved deputies Clark, Havens, and Garcia.

31. On or about February 22nd or 23rd, one interaction with CCSO began with Mr. Carson suffering from a schizophrenic episode while in the car with his mother. Mr. Carson believed he was the Star of David and needed to slay the devil. Mr. Carson got out of the car and began walking down the road.

32. Mr. Carson's mother called 911 and told the operator that her son was acting strange and she believed he might be having a schizophrenic episode.

33. After Colorado State Patrol and CCSO deputy Havens spoke with Mr. Carson, they allowed him and his mother to leave.

**C.    Havens and Clark, who were familiar with Mr. Carson and his mental health problems, took custody of Mr. Carson while he was in the midst of a schizophrenic episode and failed to secure any sort of medical assistance.**

34.    Early on February 24, Mr. Carson's already poor mental health had deteriorated to the point that he began destroying his and his mother's home.

35.    Mr. Carson shaved his head because he thought he saw the number six on his scalp and then put his dead dog's collar around his neck. Mr. Carson did not have the number six on his head.

36.    During this episode, Mr. Carson believed he was either Christ or the Antichrist and that the world had fallen into total chaos and people were killing each other *en masse*. He believed he was caught in some kind of witchcraft.

37.    Mr. Carson broke a significant amount of personal property, including picture frames he made and a desk. He threw one of his mother's oxygen tanks out of a living room window and broke out his bedroom window. He threw objects all around the living room and his bedroom. He ripped a thermostat and safety railing out of the wall.

38.    Mr. Carson's mother Arlene called 911 just before 7 a.m. and asked that they take her son to the hospital as he was having a schizophrenic episode.

39.    Mr. Carson had returned to his room when he saw a police vehicle approach. Mr. Carson believed the deputies were there because there were two bodies trapped in the crawl space below his home, or to arrest him for arson for burning a straw hat in

his living room. In reality, there were no bodies in Mr. Carson's home and he never burned a straw hat in his living room.

**a.  Mr. Carson exhibited obvious symptoms of a mental health crisis.**

40.  Clark, who had interacted with Mr. Carson on a number of occasions in the past month, came to the front door and knocked until Mr. Carson responded.

41.  Mr. Carson was agitated and swore at Clark. He told Clark he was not going to let him into the house. He also told Clark his mom was involved in witchcraft.

42.  Eventually, Mr. Carson retreated to the living room and Arlene allowed Clark inside. Upon entering, Arlene told Clark her son had mental problems.

43.  Mr. Carson yelled at Clark from the living room – Mr. Carson wanted to show Clark the wiretap that was in his head – he offered to circle the spot on his head with a marker.

44.  Mr. Carson said he did not have a mental problem. A few moments later he grabbed a butcher knife from the table and held it to his own head so he could expose

the wiretap and show it to Clark.



45.   Clark aimed his taser at Mr. Carson and told him to put the knife down. Mr. Carson told Clark to put the taser down. Clark did so and then Mr. Carson put the knife down.

46.   Mr. Carson told Clark that other cops were reading his mind and that Clark and these other cops 'knew what was going on.'

47.   Mr. Carson returned to the living room again after looking for a marker with which he could circle the spot on his head where the wiretap was implanted.

48.   Mr. Carson had Clark feel the side of his head for the wiretap, after which Clark told Mr. Carson they were going to get him medically evaluated.

49.     This agitated Mr. Carson, who remarked that there were wiretaps all over the house, the cops "knew," and he had a lawyer investigating. There were no wiretaps in Mr. Carson's home and Mr. Carson had not hired a lawyer.

50.     Mr. Carson showed Clark a drawing of a cross and some indecipherable language. He told Clark if he researched it, it would explain everything.



51.     Havens, who arrived shortly thereafter, approached Mr. Carson's room and stood in the doorway. Mr. Carson, who was hallucinating that Clark and Havens were the same person, called Havens an "imposter" and said he could not tell the difference between them.

52.     Havens entered the room where there were a number of observable empty pill bottles on the top of Mr. Carson's dresser.

53. Havens stood in front of Mr. Carson and told him they were going to take him to jail. Mr. Carson said he would not go and he thought he might hurt someone else in the jail.

54. Mr. Carson then had Havens feel his head for the wiretap.

55. Although Mr. Carson resisted due to his ongoing schizophrenic episode, Havens and Clark were able to double-cuff Mr. Carson.

56. Havens put Mr. Carson in the police cruiser after marching him through the snow in just his socks.

**b. Havens and Clark were aware that Mr. Carson was a schizophrenic and that he was not taking his medication.**

57. Clark, by his own admission, has known Mr. Carson for a long time and that recently CCSO had frequent interactions with him.

58. Havens and Clark had at least three or four interactions with Mr. Carson in the month leading up to this incident.

59. Clark had interacted with Mr. Carson just two days prior.

60. Another deputy, Garcia, had interacted with Mr. Carson just the day before. They had responded to an incident at a "James'" house a few weeks prior.

61. And then, a week after the incident at James', Clark had responded to an incident at Mr. Carson's house where he had broken a large window in the living room.

62.     After Havens placed Mr. Carson in the police cruiser, he and Clark spoke with Arlene about Mr. Carson's mental health.

63.     Clark knows Mr. Carson has mental health issues and believed that on the 24th Mr. Carson was suffering from schizophrenia. Havens believed Mr. Carson had a "chemical imbalance."

64.     Arlene told Clark and Havens that Mr. Carson had diagnosed schizophrenia, bipolar disorder, and possibly other disabilities.

65.     Arlene told Clark that Mr. Carson had just received treatment  in Denver for three or four days, but it had not helped.

66.     Arlene told Clark that Mr. Carson had been exhibiting this behavior since December of 2019.

67.     Clark asked Arlene if Mr. Carson was prescribed any medication and if he was taking it. Arlene said that Mr. Carson was prescribed medication but that he had stopped taking his pills. Clark believed Mr. Carson was trying to even out using marijuana.

68.     Arlene also confirmed Mr. Carson's mental health issues began when his father was killed about ten years prior.

**c.     Clark and Havens refused to offer Mr. Carson any help unless his mother pressed charges, and once she did, they guaranteed he would receive medical treatment.**

69.     Prior to Havens arriving, Clark spoke with Arlene at length in the kitchen while Mr. Carson moved between the living room or his bedroom.

70.     Arlene told Clark that Mr. Carson never threatened her, never abused her, and this behavior was typical when he was in the midst of an episode.

71.     Arlene asked if she could take Mr. Carson to the hospital, to which Clark said "no."

72.     Clark then told Arlene he "need[ed]" her to file charges against Mr. Carson – misdemeanor criminal mischief – that it was the only way to get him help given that he was acting "coo coo" that morning.

73.     Clark went on to say that the police could not keep coming and going to Mr. Carson's home and that it had been an ongoing issue for months.

74.     Clark encouraged Arlene to kick Mr. Carson out of her house, despite his mental health problems.

75.     When Havens arrived, he entered the house, said nothing to Arlene, and Clark told him that Mr. Carson had tried to cut something out of his head, had shaved his head, and had drawn all over his own head.

76.    After Havens returned from placing Mr. Carson in the police cruiser, Clark pressed Arlene numerous times as to whether Mr. Carson ever scared her. She said 'no' twice but finally said 'yes' the third time he prodded.

77.    Clark again told Arlene she would need to press charges to get Mr. Carson help.

78.    Arlene then told Havens and Clark she had tried to take Mr. Carson to the hospital earlier that day but Mr. Carson refused to go.

79.    Clark assured Arlene that "we'll make sure he sees the doctor today."

80.    Arlene again asked Havens and Clark take Mr. Carson to get help.

81.    Clark then told Arlene that Mr. Carson would have to go away for a while.

82.    Arlene told Clark and Havens that Mr. Carson was a good son, had helped her after her knee surgery, and when he was healthy, took care of the cooking. She also told Clark that Mr. Carson did everything around the house, including the cleaning, when he was healthy.

83.    Havens told Arlene he would take Mr. Carson down to the jail, to "get him to mental health, all that kind of stuff."

84.    Arlene again asked if they would take Mr. Carson somewhere he could get help, and Clark said, "Oh I am sure, they are very aware of Mr. Carson's issues right now."

85.    After taking a look at some additional damage outside, Clark and Havens left.

86. Havens then transported Mr. Carson to the Costilla County Jail and handed Mr. Carson over to detention officers.

87. Havens put in his report that he did contact mental health after handing Mr. Carson over to detention officers but did not indicate he remained with Mr. Carson until a CCSO employee had performed the requisite medical screening procedures.

**D. The CCSO Policy Manual requires employees follow specific protocols to ensure detainees exhibiting symptoms of mental health problems are safe and receive medical care.**

88. The assertions in this Section D are based on portions of a current CCSO Policy Manual obtained through a Colorado Criminal Justice Records Act (CCJRA) request.

89. The manual states that CCSO employees are required to familiarize themselves with the manual, periodically request updates to the manual from their supervisor, and comply with the manual's policies and procedures at all times.

90. "Detention staff are responsible for the day-to-day operations of the detention center, which includes the safety of inmates[.]"

91. Upon information and belief, CCSO will customarily hold individuals for 72 hours on mental health holds, that it has no policies on mental health holds, and that it does not typically make records when placing someone on a mental health hold.

**a. CCSO and its employees should never have admitted Mr. Carson to the jail.**

92.     A detainee may not be admitted to the CCJ without written documentation. When booking in a detainee, the booking deputy is supposed to fill out a screening form and a health history form. The arresting deputy is supposed to remain with a detainee until a medical one form and medical screening form is completed.

93.     CCSO employees shall not admit anyone exhibiting serious signs of health problems to CCJ without a proper medical referral.

94.     A CCSO employee is supposed to consult with a health care authority or designated provider prior to taking any action regarding a detainee who he either suspects or knows is diagnosed with a significant psychiatric illness. If a detainee requires psychiatric care which CCSO cannot provide, CCSO employees are not supposed to admit that detainee to CCJ.

95.     CCSO employees are not to admit any detainee who indicates he is on medication but does not have it, and that medication cannot be obtained, and the condition is serious.

96.     CCSO employees may not admit a detainee who is showing obvious signs and symptoms of a mental illness.

97.     CCSO employees may only admit a detainee in such circumstances if that detainee has received a medical examination by a medical professional and that medical professional clears the detainee, in writing, to be admitted.

**b.** **CCSO employees should have placed Mr. Carson in segregated housing and observed him regularly.**

98.     CCSO employees are supposed to protect mentally ill inmates from harming themselves and others.

99.     CCSO employees must segregate a mentally ill detainee from other inmates, surveil him no less than every fifteen minutes, and refer him to the mental health center.

100.    Employees on duty are to keep a written report detailing that detainee's actions, when they observed him, and his condition when they observed him. Employees are also supposed to inform deputies taking over at shift change of their observations.

101.    If CCSO employees admit a detainee who is diagnosed with a significant psychiatric illness, said employees must consult with health care authority before assigning that detainee to housing.

102.    CCSO employees may place a detainee in a classification pod for up to 72 hours to observe that detainee's behavior.

103.    If a booking officer determines that a detainee has either a health condition that requires medication or an emotional condition requiring surveillance, he is supposed to place that detainee in an unoccupied cell, notify the shift supervisor and inform him of the detainee's condition, and make a record on the health screening form of his observations and any action he took. The shift supervisor may order an employee to take the detainee to the hospital or to receive some other form of medical attention.

**c.  CCSO employees should have monitored Mr. Carson while they detained him at CCJ.**

104.    Hourly monitoring is also required of all inmates, and during such checks, the officer is required to observe the inmates' behavior and appearance for any unusual or questionable situations and events, including emotional problems and injury.

105.    CCSO employees are supposed to routinely observe all inmates for behavior indicative of potential suicide.

106.    If an inmate is suspected of being a suicide risk or of being mentally ill, CCSO employees are supposed to isolate him and closely observe him. Staff may also ask other inmates to observe him. Staff are then supposed to notify the jail medical care technician immediately.

107.    When a detainee is a suicide risk, CCSO employees are supposed to take away any items with which he could commit suicide, including items with which he could strangle himself.

108.    CCSO employees are supposed to identify any items or facilities within the jail that need to be replaced to meet the requirements of the jail.

**d.  CCSO employees failed to provide emergency medical services when they took detained Mr. Carson at CCJ, and after he attempted to commit suicide.**

109.    In the case of an emergency, employees are supposed to call 911 and request medical assistance.

110. Emergency medical care is available 24 hours per day.

111. If there is a medical emergency, the CCSO employee is required to notify the dispatcher and request additional assistance from an on-duty deputy or jail supervisor.

112. Psychological and psychiatric services are also available to inmates who exhibit signs of emotional instability or psychological distress.

113. If a detainee shows signs and symptoms of a psychiatric illness after being admitted to the jail, CCSO employees are supposed to refer that detainee to the health care authority or designated health care provider without unnecessary delay.

**E.     The Costilla County detention employees, despite having knowledge of Mr. Carson's history of schizophrenia and his psychotic mental state when he entered their custody, failed to follow their own policies to ensure Mr. Carson's safety.**

114. The assertions in this Section E are based on Mr. Carson's memory of events, contemporaneous medical records, and the fact that, in response to a CCJRA request, CCSO stated it did not have *any* records pertaining to Mr. Carson's intake into CCJ. Upon information and belief, CCSO has no other records of Mr. Carson's incarceration from February 24 through February 25 of 2020.

115. Sanchez and an Unidentified CCSO Employee booked Mr. Carson into CCJ.

116. When CCSO employees took custody of Mr. Carson, he was still wearing a dog collar, half of his head was shaved and covered in marker, and he was shoeless.

117.    An Unidentified CCSO Employee told Mr. Carson he was being held on numerous charges, including felonies, but CCSO did not actually charge Mr. Carson until March 3, 2020.

118.    Mr. Carson's prior arrest record from 2018, and his four interactions with CCSO and CCJ over the past month indicate Sanchez, Gamboa, and Unidentified CCSO Employees were aware Mr. Carson had significant mental health problems.

119.    Sanchez and Unidentified CCSO Employees did not make a record of Mr. Carson's intake into the jail.

120.    Sanchez and Unidentified CCSO Employees did not perform a mental health screening when they booked Mr. Carson into the jail.

121.    Sanchez and an Unidentified CCSO Employee did not attempt to learn if Mr. Carson had medication, if that medication was available, or if he needed medication.

122.    Unidentified CCSO employees did not place Mr. Carson in either a classification pod or in isolated housing. Instead, despite the fact Mr. Carson was still in the midst of a schizophrenic episode, officers placed Mr. Carson in general population with other inmates.

123.    While in jail, Mr. Carson learned from a cousin who was also incarcerated that his uncle had died.  He looked obsessively for things to clean, his usual habit when in the middle of a schizophrenic episode.

124.    After cleaning, Mr. Carson kicked open the locked recreation room door and began punching the workout machine.  He spent time pacing back and forth in the day room, talking to himself, scaring other inmates.

125.    Mr. Carson's cellmate was a man he believed may have been involved in his father's death, Eddie Lobato.

126.    Mr. Carson was afraid Eddie might try to kill him, and he looked for weapons he could use. He noticed exposed wires from a fan, and he picked up a loose metal shower drain, and threw it around the jail like it was a frisbee, though he considered using it against Eddie.

127.    Despite Mr. Carson's behavior, no Unidentified CCSO Employees attempted to get Mr. Carson medical care.

128.    Mr. Carson then got the idea to kill himself when he remembered another paranoid schizophrenic he knew, Jessie Contreras, had tried to kill himself in CCJ by slicing his wrists with a shaving razor.

129.    Mr. Carson found an intercom box with exposed wiring. Mr. Carson wrapped the wires around his neck numerous times, picked up the intercom box, and threw the box to the ground over and over again, attempting to "stop the voices in his head."

130.    While attempting to kill himself, Mr. Carson passed out; he may have electrocuted himself.

131.   Mr. Carson does not know who removed the wiring from his neck, but he believes it was other inmates.

132.   An officer then put Mr. Carson in his bunk and told him to go to sleep.

133.   Mr. Carson believes the other inmates alerted CCSO employees that he had tried to kill himself.

134.   At some point, Mr. Carson tried using the call button in his cell, which is there in case a detainee needs help, and nobody came.

135.   After discovering what Mr. Carson had tried to do, Unidentified CCSO Employees did not call for emergency medical care.

136.   Throughout Mr. Carson's detention, Unidentified CCSO Employees did not check on him – every fifteen minutes or even every hour – to make sure he was not harming himself or others.

**F.     After Mr. Carson attempted to kill himself, CCSO officers waited hours to transport Mr. Carson to the hospital for mental health treatment.**

137.   Unidentified CCSO Employees did not transport Mr. Carson to the regional medical center until the next day, over twenty-six hours after Sanchez and an Unidentified CCSO Employee had first booked him into CCJ and only after he had tried to kill himself.

138.   While at the regional medical center, staff noted ligature marks on Mr. Carson's neck and that the chief complaint was a suicide attempt while in jail.

139.    The regional medical center placed a suicide watch on Mr. Carson and monitored him closely, including a full-time behavioral monitor.

140.    The next day, the regional medical center transported Mr. Carson to Centennial Peaks, a hospital in the Denver Metro area, for longer-term treatment.

141.    Mr. Carson spent three weeks at Centennial Peaks receiving mental health treatment, which included electro-shock therapy.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Fourteenth Amendment Violations**
**(Against Defendants Sanchez, Gamboa, Clark, Havens, and Unidentified CCSO Employees)**

#### a.    Deliberate Indifference to a Serious Medical Need

142.    Mr. Carson incorporates all prior paragraphs of this Complaint.

143.    CCSO is a municipal law enforcement agency and all other Defendants are agents or employees of CCSO, meaning they acted under color of state law.

144.    Mr. Carson's schizophrenia has been diagnosed for over ten years. Even a lay person would recognize the need for medical attention after seeing a person try to dig wiretaps out of their head with a butcher knife.

145.    Mr. Carson's medical history and resulting behavior was well-known to CCSO and its employees.

146.    Defendants Clark and Havens disregarded a substantial risk of harm caused by Mr. Carson's schizophrenic episode by failing to make *any* effort to secure immediate medical care for him.  Instead, they insisted his mother press charges against Mr. Carson and arrested him.

147.    Defendant Havens disregarded a substantial risk of harm when he failed to ensure Defendant Sanchez and an Unidentified CCSO Employee medically screened Mr. Carson before admitting him to the jail.

148.    Defendants Sanchez, Gamboa, and Unidentified CCSO Employees disregarded the substantial risk of harm caused by Mr. Carson's schizophrenic episode by failing to take *any* measures to ensure Mr. Carson's safety or secure medical care for him when admitting him and then holding him in CCJ.

149.    Defendants Sanchez, Gamboa, and Unidentified CCSO Employees took no reasonable measures to mitigate the substantial risk of harm, such as creating adequate records based on the repeated encounters with Mr. Carson, providing him medication, confining him in a cell by himself, monitoring him while he was in custody, or transporting him to a medical facility better equipped to help him.

150.    Defendant Sanchez made no effort to supervise his employees while he was on shift during Mr. Carson's detainment.

151. Defendants Sanchez, Gamboa, Clark, Havens, and Unidentified CCSO Employees' acts or omissions show a reckless disregard for Mr. Carson's health and his federally protected right to medical care while incarcerated.

152. As a result of Defendants Sanchez, Gamboa, Clark, Havens, and Unidentified CCSO Employees' acts or omissions, Mr. Carson suffered serious harm when he when he tried to strangle himself so the voices would stop.

### b. Conditions of Confinement

153. Mr. Carson incorporates all prior paragraphs of this Complaint.

154. No one at CCJ repaired the intercom system that Mr. Carson used to attempt suicide.

155. It is plainly obvious to a reasonable officer that people held in a jail could use thick, exposed wiring to strangle themselves or another person, not to mention the damage to be done if the wires were live.

156. Defendants Sanchez, Gamboa, and Unidentified CCSO Employees' took no reasonable available measures to abate the risk of harm, such as removing the intercom system or securing the wires to a wall.

157. Defendants Sanchez, Gamboa, and Unidentified CCSO Employees' acts or omissions show a reckless disregard for Mr. Carson's health and his federally protected right to adequate conditions of confinement.

158. As a result of Defendants Sanchez, Gamboa, and Unidentified CCSO Employees' acts or omissions, Mr. Carson suffered serious harm when he tried to strangle himself so the voices would stop.

### c. Failure to Protect

159. Mr. Carson incorporates all prior paragraphs of this Complaint.

160. Given Mr. Carson's history with CCSO and his behavior during this and prior episodes, it is plainly obvious that treating Mr. Carson like any other pretrial detainee created a substantial risk of harm to Mr. Carson or other inmates.

161. Defendants Sanchez, Gamboa, and Unidentified CCSO Employees took no reasonable measures to protect Mr. Carson from himself or other inmates from Mr. Carson, such as getting him immediate emergency medical care upon arresting him, medically screening him prior to taking custody of him, providing him medication, confining him in a cell by himself, monitoring him while he was in custody, or transporting him to a medical facility better equipped to help him.

162. Defendant Sanchez made no effort to supervise his employees while he was on shift during Mr. Carson's incarceration.

163. Defendants Sanchez, Gamboa, and Unidentified CCSO Employees' acts or omissions show a reckless disregard for Mr. Carson's health and his federal right to be protected while incarcerated.

164. As a result of Defendants Sanchez, Gamboa, and Unidentified CCSO Employees' acts or omissions, Mr. Carson suffered serious harm when he tried to strangle himself so the voices would stop.

## SECOND CLAIM FOR RELIEF

### Violations of the Americans with Disabilities Act
### (Against Defendant Costilla County Sheriff's Office)

165. Mr. Carson incorporates all prior paragraphs of this Complaint.

166. At all relevant times, Mr. Carson was a person with a disability, had a record of a disability, or was regarded as having a disability by Defendant CCSO. Mr. Carson's schizophrenia and bipolar disorder substantially limited a variety of major life activities, including but not limited to mentally processing current events, thinking, learning, concentrating, comprehending, interacting with others, sleeping, and effectively coping with anxiety and stress.

167. Defendant CCSO is a public entity as the term is used in Title II of the ADA.

168. Mr. Carson was qualified to receive the services, programs, activities, and benefits provided to citizens of CCSO within the meaning of Title II of the ADA.

169. Defendant CCSO discriminated against Mr. Carson based on his disabilities and failed to reasonably accommodate his disabilities despite knowing he suffered from a number of disabilities, including paranoid schizophrenia and bipolar disorder. This

violated clearly established law under Title II of the ADA and its implementing regulations.

170.　Defendant CCSO had no legitimate basis for violating Mr. Carson's rights conferred by the ADA.

171.　Defendant CCSO failed (and continues to fail) to properly train, supervise and/or discipline their employees regarding the proper treatment of, and accommodations for, individuals with disabilities and, in particular, psychological disabilities.

172.　The inadequate training, supervision, and/or discipline results from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendant CCSO.

173.　Prior to the events described here, Defendant CCSO developed and maintained policies or customs that exhibited deliberate indifference to the rights of persons with disabilities, including the rights of mentally and emotionally disabled persons, and caused a violation of Mr. Carson's rights.

174.　It was the policy or custom of the Defendant CCSO to inadequately train its officials, including those identified herein, thereby failing to adequately prevent violations of the rights of disabled persons, including the rights of mentally and emotionally disabled persons, such as Mr. Carson.

175. Defendant CCSO did not require appropriate in-service training or re-training of officials concerning the rights of people with disabilities, including the rights of mentally and emotionally disabled persons.

176. Mr. Carson has been and continues to be damaged by Defendant CCSO's unlawful conduct under the ADA.

177. The acts or omissions of Defendant CCSP including the unlawful policy, procedure, custom and/or practice described herein, were the legal and proximate cause of Mr. Carson trying to strangle himself so the voices would stop.

## THIRD CLAIM FOR RELIEF

### Municipal Liability under § 1983
### (Against Defendants Costilla County and Costilla County Sheriff's Office)

### a.     CCSO Custom Caused Mr. Carson's Injury

178. Mr. Carson incorporates all prior paragraphs of this Complaint.

179. CCSO has a custom of not providing proper mental health care for people it arrests and incarcerates.

180. CCSO's lax oversight has allowed at least one other person with schizophrenia, Jessie Contreras, to attempt suicide in CCJ.

181. CCSO routinely incarcerates people on mental health holds without making any records as to their intake into CCJ or their medical needs.

182. Mr. Carson's injury was a highly predictable and a plainly obvious consequence of this custom.

183. On January 31, 2020, CCSO had incarcerated Mr. Carson during a mental health episode, then sent him to the hospital. In February, CCSO employees had at least three encounters with Mr. Carson during a mental health episode. And yet in late February, after Defendants Clark and Havens finding him trying to dig wiretaps out of his head with a knife, they took him to CCJ and treated him like any other inmate.

184. Defendants Sanchez, Gamboa, and Unidentified CCSO Employees did not segregate Mr. Carson from other people in the jail, they did not regularly monitor him, they did not provide him medication, they did not ensure he did not have the means to harm himself or others, and they did not transport him to a medical facility or otherwise try to provide any medical care.

185. This chain of events is sufficiently egregious to show that CCSO's custom of disregarding mental health needs violated both Mr. Carson's constitutional rights and his rights under the ADA. These violations were the moving force behind Mr. Carson's injury.

### b. CCSO Failed to Train and Supervise its Officers

186. Mr. Carson incorporates all prior paragraphs of this Complaint.

187.    CCSO failed to train and supervise its officers in its written intake procedures of people dealing with mental health issues.

188.    CCSO failed to train and supervise its officers to ensure that Mr. Carson was given an intake screening and mental health screening upon arrival at CCJ; that Mr. Carson was provided all necessary medication; that Mr. Carson was "single-celled" to protect himself and other inmates; that detention officers would check on Mr. Carson every fifteen minutes; that employees would contact mental health services and secure medical care, and that Mr. Carson would not have the means to attempt suicide.

189.    CCSO has no written record of Mr. Carson being in CCJ in early 2020.  CCSO has no written intake form describing the mental health screening CCSO policy requires when CCJ intakes a person with mental health issues. CCSO has no written record of Mr. Carson trying to kill himself in the jail.  CCSO has stated it does not create paperwork for people they incarcerate on a mental health hold. These facts indicate CCSO's woeful failure to train and supervise its officers violated both Mr. Carson's constitutional rights and his rights under the ADA.

190.    These violations played a substantial part in bringing about Mr. Carson's injury. Had CCSO detention officers single-celled him, provided him medication or secured mental health care, or checked on him every fifteen minutes, Mr. Carson would not have accessed the exposed intercom wires, let alone wrapped them around his neck.

## VII.   PRAYER FOR RELIEF

Mr. Carson requests this Court enter judgment for him and against each defendant, and award him all relief allowed by law, including:

a.      An injunction against all defendants in their official capacity to adhere to CCSO's written policies regarding the admittance, medicating, housing, monitoring, and transporting of defendants with mental health disabilities that make them vulnerable to hurt themselves or others while incarcerated.

b.      A declaration that Defendants deprived Mr. Carson of his right to receive adequate medical care while incarcerated, failed to maintain safe conditions of confinement, and failed to protect Mr. Carson, as are his rights under the 14th Amendment to the U.S. Constitution and the Americans with Disabilities Act.

c.      Damages against Defendants in their individual and official capacities.

d.      Damages and injunctive relief against Defendant Sanchez in his official capacity.

e.      Attorney's fees and costs associated with this action as allowed by law.

f.      Any further relief this Court deems necessary in the interest of justice.

## VIII.  JURY TRIAL DEMAND

Mr. Carson hereby demands a trial by jury.

Respectfully Submitted,

_s/ Joseph Chase_
Joseph Chase

_s/ Andrew Shulman_
Andrew Shulman
Brown Chase & Shulman
P.O. Box 101868
Denver, CO 80250
Telephone: (703) 334-8051
joey@bcs.legal
andrew@bcs.legal

_Counsel for Mr. Jessie Carson_

## CERTIFICATE OF SERVICE

I hereby certify on this 16th day of July 2021, I electronically filed the foregoing **COMPLAINT** with the Clerk of the Court using the CM/ECF system which will automatically notification of such filing with all appropriate parties of record.

*s/Crystal Hendry*
Crystal Hendry
Paralegal