IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-01942-RMR-MEH

JESSIE CARSON

       Plaintiff,

v.

DANNY SANCHEZ, SHERIFF OF COSTILLA COUNTY, in his individual and official
capacity;
NOBEL HAVENS, in his individual and official capacity;
ROBERT CLARK, in his individual and official capacity;
CRUZ SOTO, in his individual and official capacity;
CALEB SANCHEZ, in his individual and official capacity;
TOMMY TRIPP, in his individual and official capacity;
ANGELA ESQUIBEL, in her individual and official capacity; and
ABIGAIL GAMBOA, in her individual and official capacity;

       Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Michael E. Hegarty, United States Magistrate Judge**.

     This lawsuit concerns the suicide attempt of Jessie Carson ("Mr. Carson") while detained

on a mental health hold at the Costilla County Jail ("Jail"). Mr. Carson brings this suit against

officials from the Costilla County Sheriff's Office ("CCSO") asserting claims of deliberate

indifference, municipal liability under Section 1983, and a violation of the Americans with

Disabilities Act ("ADA"). Sheriff Danny Sanchez ("Sheriff Sanchez") and Deputies Nobel Havens

("Deputy Havens"), Robert Clark ("Deputy Clark"), Cruz Soto ("Deputy Soto"), Caleb Sanchez

("Deputy Sanchez"), Tommy Tripp ("Deputy Tripp"), Angela Esquibel ("Deputy Esquibel"), and

Abigail Gamboa ("Deputy Gamboa") (collectively, "Defendants") filed two Motions to Dismiss

pursuant to Fed. R. Civ. P. 12(b)(6). ECF 18 and 26. The first Motion responds to Mr. Carson's

First Amended Complaint, ECF 14, and the second Motion responds to the Second Amended Complaint ("SAC"), ECF 24, which names several previously unidentified defendants. Both Motions are fully briefed and have been referred by District Judge Regina M. Rodriguez for a recommendation. ECF 11 and ECF 27. The Court finds that oral argument would not materially assist it in adjudicating the Motions.  As set forth below, this Court respectfully recommends granting both Motions without prejudice to amend the complaint.

## **BACKGROUND**

### I. Allegations

At issue is Mr. Carson's Second Amended Complaint ("SAC"). The Court accepts his well-pleaded allegations as true for present purposes. The following are the relevant, material factual allegations (as opposed to legal conclusions, bare assertions, or conclusory allegations) made by Mr. Carson in the SAC, which are taken as true for analysis under Fed. R. Civ. P. 12(b)(6) pursuant to *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Mr. Carson is fifty-one years old and lives in Costilla County, Colorado with his mother ("Mrs. Carson"). Approximately twelve years ago, he was diagnosed with paranoid schizophrenia and bipolar disorder. ECF 24 at ¶ 11. With these illnesses, Mr. Carson sometimes experiences schizophrenic "episodes," during which he may hallucinate that he hears voices, imaginary events occur, and there are wiretaps both inside and around him. *Id*. at ¶¶ 12–15. The episodes also cause him to believe that he must hurt or kill himself to make the voices stop. *Id*. at ¶ 13. During an episode, Mr. Carson fluctuates between complete delusion and a general grasp of reality, and he takes medication to stem these effects. *Id*. at ¶¶ 16–17. The SAC alleges that the CCSO and its officials were aware of his mental disability when he was taken into custody and held at the Jail, where he attempted to commit suicide. *Id*. at 8, 16, 21, 30.

Mr. Carson asserts that beginning in 2012, officials at the CCSO documented his mental health condition and potential to harm both himself and others. *Id*. at ¶ 22. He also explains that in 2018, he had two incidents with CCSO employees during which deputies acknowledged that he had mental issues, and they sought medical attention for him. *Id*. at ¶¶ 24–27. Recently, Mr. Carson encountered CCSO officials several more times, including one occasion where deputies arrested him and sent him to the San Luis Valley Hospital ("SLVH") for auditory hallucinations and suicidal thoughts. *Id*. at ¶ 32. SLVH transferred Mr. Carson to an in-patient facility for several days of treatment. *Id*. at ¶¶ 32, 70. One month later, Mr. Carson was in the car with his mother and had a schizophrenic episode. *Id*. at ¶ 35. Mrs. Carson called 911, and officials from the CCSO and the Colorado State Patrol responded. *Id*. at ¶ 36. Mr. Carson and his mother were allowed to return home after the incident, but the events leading to this lawsuit erupted two days later.

On the morning of February 24, 2020, Mr. Carson had another schizophrenic episode. *Id*. at ¶ 45. He shaved his head thinking there was a number on his scalp, put on a dog collar, accused his mother of being involved in witchcraft, and destroyed property at her house. *Id*. at ¶¶ 38, 40, 45. Mrs. Carson called 911 and asked the operator to take Mr. Carson to the hospital. *Id*. at ¶ 42. Deputy Clark, from the CCSO, responded to the scene. *Id*. at ¶ 44. When he arrived, Mrs. Carson told him that her son had mental health issues. *Id*. at ¶ 46. Mr. Carson, who was in the house, called to Deputy Clark, grabbed a large kitchen knife (which the SAC refers to as a "butcher knife"), held it over his head, and offered to use it to expose a wiretap he thought was embedded there. *Id*. at ¶ 48. Mr. Carson put the knife down after Deputy Clark ordered him to do so. ECF 24 at ¶ 48. A second officer, Deputy Havens, arrived soon after. *Id*. at ¶ 55. After he insisted that both officers feel his head for wiretaps, Deputies Clark and Havens arrested Mr. Carson and put him in Deputy

Havens' police vehicle. *Id*. at ¶¶ 52, 58–60. Both deputies told Mrs. Carson they intended to ensure her son received mental health treatment at the Jail. *Id*. at ¶¶ 84, 88–89.

Deputy Havens transported Mr. Carson to the Jail and transferred him to either Sheriff Sanchez or one of the CCSO deputies for intake. *Id*. at ¶ 92. (Mr. Carson is not certain which officer was on duty throughout his detainment, but he names Deputies Soto, Sanchez, Tripp, and Esquibel. Given his uncertainty, this Recommendation refers to these potential booking and duty officers as the "Jailers." The Court will assume that Sheriff Sanchez did not personally perform intake and detention monitoring tasks.) *Id*. at ¶¶ 92, 119. According to the SAC, no written record exists of Mr. Carson's in-processing. *Id*. at ¶¶ 126–27. Deputy Havens' incident report noted that after releasing Mr. Carson to one of the Jailers, he contacted "mental health" to advise them of Mr. Carson's condition. *Id*. at ¶ 93. At booking, Mr. Carson showed signs of an ongoing schizophrenic episode, but he did not receive a mental health screening. *Id*. at ¶¶ 128, 133. After his initial processing, Mr. Carson was placed into the Jail's general population. *Id*. at ¶ 113. Throughout his detainment, he continued to exhibit signs of his schizophrenic episode including punching and kicking things, pacing and speaking to himself, and throwing a loose metal shower drain. *Id*. at ¶¶ 113, 139.

Mr. Carson asserts that neither the Jailers nor Deputy Gamboa – who served as the Jail's administrative clerk – kept records of his entire detainment, provided him with in-detention medical care, or transported him to the hospital for over a day. *Id*. at ¶¶ 113, 151. He remained in the general population, rather than being isolated, and the duty officer did not regularly monitor him. *Id*. at ¶¶ 113, 119. At some point during his detention, Mr. Carson found a broken intercom box with exposed wiring. *Id*. at ¶ 142. He wrapped the wires around his neck, picked up the box, and repeatedly threw it to ground until he passed out in an apparent attempted suicide. *Id*. at ¶¶

4

142–43. He regained consciousness when someone removed the wires from his neck, though Mr. Carson is not sure who did. *Id*. at ¶¶ 144–45. One of the Jailers put him in bed but did not attempt to seek immediate medical care for him. *Id*. at ¶¶ 119, 146. Sometime in the next few hours, Mr. Carson attempted to use the emergency call buttons to get help, but the Jailers did not respond. *Id*. at ¶ 148. The next morning, Mr. Carson was transported to a medical care facility, where the staff put him on suicide watch. *Id*. at 31. He was continuously monitored until the medical staff transferred him to the Centennial Peaks Hospital for long-term treatment. *Id*. at ¶¶ 154–55. Mr. Carson remained at Centennial Peaks for three weeks. *Id*. at ¶ 156.

## II. Claims for Relief

The SAC claims three causes of action against the Defendants. First, Mr. Carson claims that each Defendant is liable for deliberate indifference to his serious medical needs, inadequate conditions of confinement, and failure to protect him. *Id*. at 33–35. Second, he claims that Sheriff Sanchez, in his official capacity, violated Title II of the Americans with Disabilities Act ("ADA") by failing to accommodate Mr. Carson's known mental disabilities. *Id*. at 37. Third, he brings a *Monell* claim against Sheriff Sanchez, in his official capacity, for establishing a custom of not providing inmates with proper mental healthcare and for failing to train and supervise his subordinates. *Id*. at 39, 41. Pursuant to Fed. R. Civ. P. 25(a), the Court dismisses claims against Deputy Esquibel based on notification of her death. ECF 25. Below, the Court assesses Mr. Carson's deliberate indifference claims, then his *Monell* claims, and finally his Title II claim.

## LEGAL STANDARDS

The purpose of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pleaded facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id. Twombly* requires a two-prong analysis. First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id.* at 680. Second, the Court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 679.

Plausibility refers "'to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011). Thus, while the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1192. However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action," so that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at

555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has made an allegation, "but it has not shown that the pleader is entitled to relief." *Id.* (quotation marks and citation omitted).

## ANALYSIS

### I. Deliberate Indifference Claims

Mr. Carson claims that each Defendant's deliberate indifference violated the Fourteenth Amendment. His claim has three parts: deliberate indifference to a serious medical need, inadequate conditions of confinement, and failure to protect. The Court addresses each part in turn.

#### A. Deliberate Indifference to a Serious Medical Need

The Fourteenth Amendment provides pre-trial inmates the same due process protections that convicted inmates are entitled to under the Eighth Amendment. *Martinez v. Beggs*, 563 U.S. F.3d 1082, 1088 (10th Cir. 2009). Therefore, Fourteenth Amendment claims are analyzed under an identical analysis as Eighth Amendment claims. *Sawyers v. Norton*, 962 F.3d 1270, 1282 (10th Cir. 2020). "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). A claim for deliberate indifference must satisfy an objective and subjective component. *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006). The objective component is met if the plaintiff can show that "the harm suffered is sufficiently serious to implicate the Cruel and Unusual Punishment Clause." *Id.* (citation and quotation marks omitted). "To prevail on the subjective component, the

prisoner must show that the defendants knew that he faced a substantial risk of harm and disregarded that risk[ ] by failing to take reasonable measures to abate it." *Id.* (citation and quotation marks omitted). "'[A]n inadvertent failure to provide adequate medical care' does not give rise to an Eighth Amendment violation." *Id.* (quoting *Estelle*, 429 U.S. at 105–06).

    1.  <u>Objective Element</u>

"A 'medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Sealock v. Colo.*, 218 F.3d 1205, 1209 (10th Cir. 2000)). Mr. Carson contends that the objective element of the deliberate indifference test is met because he was medically diagnosed with paranoid schizophrenia and bipolar disorder. ECF 20 at 7. He also argues that throughout the events in the SAC, he exhibited such serious symptoms that even a lay person would know that he required medical attention. *Id.* The Defendants do not contest these assertions. ECF 20 at 7. The Court considers the objective element satisfied based on Mr. Carson's medical diagnosis, which requires treatment, and assumes as sufficient for present purpose the allegation that his symptoms were serious enough for a lay person to perceive the need for medical attention.

    2.  <u>Subjective Element</u>

When considering deliberate indifference to a serious medical need, the subjective element requires a plaintiff to show that (1) the official knew of the facts that could be used to infer a substantial risk and (2) he actually made that inference. *Mata*, 427 F.3d at 751. Tenth Circuit case law recognizes two types of conduct involving medical treatment that may indicate deliberate indifference. First, there are cases in which a medical professional fails to treat a serious medical condition properly. *Sealock*, 218 F.3d at 1211. Mr. Carson brings no such claim. Second, deliberate

indifference may be found when prison officials prevent an inmate from receiving treatment or deny him access to the appropriate personnel who can provide or evaluate the need for treatment. *Id*. To be found liable, an officer must act with a "'sufficiently culpable state of mind.'" *McCowan v. Morales*, 945 F.3d 1276, 1292 (10th Cir. 2019) (quoting *Requena v. Roberts*, 893 F.3d 1195, 1215 (10th Cir. 2018)). Mr. Carson alleges that the subjective element is met with respect to each Defendant. The Court considers each Defendant's liability below.

<u>Deputy Clark</u>

Deputy Clark was the first official to respond to Mrs. Carson's home on the morning she called 911 seeking help for her son. Soon after Deputy Clark's arrival, Mr. Carson offered to use a kitchen knife to show him the wiretap Mr. Carson thought was in his head. ECF 24 at ¶ 13. Although Mr. Carson was not intending to commit suicide at the time, the act of holding a kitchen knife over his own head and offering to use it on himself demonstrates suicidal potential.

For the Court to infer that the subjective element of deliberate indifference to a serious medical need is met, Mr. Carson must demonstrate that Deputy Clark knew of his substantial risk of self-harm and ignored that risk, resulting in a denial of access to treatment. To demonstrate that Deputy Clark's actions rose to this level, Mr. Carson emphasizes that the deputy knew of his substantial risk of self-harm because he had encountered Mr. Carson on other occasions before the events of this case, he witnessed Mr. Carson's behavior on the day of his arrest, and he spoke with Mr. Carson's mother about ensuring he had access to mental health services. ECF 28 at 10. According to the SAC, Deputy Clark failed to make any effort to secure immediate medical care for Mr. Carson. ECF 24 at ¶ 162.

Mr. Carson's assertions indicate that Deputy Clark knew sufficient facts to infer that he was at a substantial risk of self-harm. However, he does not allege sufficient facts to support his

conclusion that Deputy Clark ignored that risk by not attempting to secure immediate medical care for him. The officer responded to the scene, explained his intention of making sure Mr. Carson received medical care, and helped put him in Deputy Havens' vehicle for transportation to the Jail so he could access that treatment. Mr. Carson does not plead any additional facts demonstrating other ways that Deputy Clark prevented him from access to medical treatment. The allegations Mr. Carson does present are not sufficient for the Court to infer that Deputy Clark ignored Mr. Carson's risk of self-harm or prevented his medical treatment to an extent that satisfies the subjective element. Therefore, Mr. Carson has not sufficiently pleaded a plausible claim that Deputy Clark was deliberately indifferent to his serious medical need.

<u>Deputy Havens</u>

Deputy Havens responded with Deputy Clark to arrest Mr. Carson. *Id*. at ¶ 55. Mr. Carson alleges that he and Deputy Havens also had several prior encounters before the events that led to this lawsuit. *Id*. at ¶¶ 33, 36, 55. On the day he arrested Mr. Carson, Deputy Havens arrived late, but he had the same information of the morning's events that Deputy Clark did. *Id*. at ¶ 80.

As in his claim against Deputy Clark, Mr. Carson has the burden to demonstrate that Deputy Havens knew of his substantial risk of self-harm and ignored that risk, resulting in a denial of access to medical care. Mr. Carson asserts that the subjective element of deliberate indifference is satisfied with respect to Deputy Havens because he knew the same information that Deputy Clark did, spoke with his mother about his condition, and did not stay with him to ensure a medical screening occurred at intake. *Id*. at 17, 19–20, 33. According to the SAC, Deputy Havens did not do anything to get immediate medical attention for Mr. Carson. *Id*. at 32.

Like Deputy Clark, Mr. Carson's allegations indicate that Deputy Havens knew that Mr. Carson was at a substantial risk of self-harm. However, he does not support his conclusion that

Deputy Havens ignored that risk. Deputy Havens may not have waited to ensure a medical screening occurred, but his incident report does indicate that he called "mental health" to explain Mr. Carson's situation. *Id*. at ¶ 93. Mr. Carson does not allege additional facts supporting the conclusion that Deputy Havens ignored his risk or that he prevented or delayed his access to medical treatment. Therefore, Mr. Carson's allegations are not enough to support his claim that the subjective element is met, and he has not sufficiently pleaded a plausible claim that Deputy Havens was deliberately indifferent to his serious medical need.

<u>Sheriff Sanchez</u>

Sheriff Sanchez is the Sheriff of Costilla County, and according to the SAC, he was personally involved in Mr. Carson's intake process and was supposed to monitor him while he was incarcerated. *Id*. at 20–32. Mr. Carson's burden is the same in his claim against Sheriff Sanchez that it was in his claims against Deputies Clark and Havens. He argues that the subjective element of deliberate indifference is met based on Sheriff Sanchez's access to the CCSO's records on Mr. Carson and his interactions with Mr. Carson on the day he was booked and detained at the Jail. *Id*. at 27. According to the SAC, Sheriff Sanchez also failed to make a record of Mr. Carson's intake, perform a mental health screening, secure medication for him, or isolate him from the general population of the Jail. *Id*. at 28.

Despite Mr. Carson's allegation that Sheriff Sanchez was personally involved in booking and monitoring him, *Id*. at 20–32, the Court believes this is unlikely. Additionally, although the CCSO may have possessed records regarding Mr. Carson's condition, he does not show how Sheriff Sanchez had personal knowledge of those records or the information they contained. Mr. Carson does not allege further facts to indicate that Sheriff Sanchez knew of his condition. Because the Court assumes that Sheriff Sanchez was not personally involved in Mr. Carson's case and he

has not shown that the Sheriff was familiar with the information in the CCSO's records, he has not met the burden for the subjective element. Therefore, Mr. Carson has not sufficiently pleaded a plausible claim that Sheriff Sanchez was deliberately indifferent to his serious medical need.

### Deputy Gamboa

Deputy Gamboa was the Jail's clerk, and Mr. Carson alleges that her duties included maintaining the condition and safety of the Jail. *Id*. at ¶ 9. The SAC argues that Deputy Gamboa, too, had knowledge of Mr. Carson's risk of suicide based on the CCSO's records. *Id*. at ¶ 130. But, like the analysis for Sheriff Sanchez, Mr. Carson does not allege sufficient facts to show that Deputy Gamboa had personal knowledge of these records. Mr. Carson also does not suggest that she was physically present at any time throughout the events of this case. Because Mr. Carson does not explain how Deputy Gamboa knew that he was either arrested or at the Jail, he has not satisfied the burden of alleging that she knew he was at a substantial risk of self-harm and ignored that risk. Therefore, Mr. Carson's allegations do not support his claim that the subjective element is met with respect to Deputy Gamboa, and he has not sufficiently pleaded a plausible claim that she was deliberately indifferent to his serious medical need.

### Deputies Soto, Sanchez, and Tripp

As discussed above, Deputies Soto, Sanchez, or Tripp may have been on duty at the Jail while Mr. Carson was incarcerated. (Deputy Esquibel may have been on duty, too, but the Court dismisses his claims against her because of the notification of her passing.) The SAC does not indicate which deputy was involved at the various times of Mr. Carson's detainment, so the Court assesses the claims against these deputies as a group for the purpose of this Recommendation. Additionally, it appears to the Court that Mr. Carson intended to include Deputy Soto wherever he

discussed Deputies Sanchez and Tripp in the SAC. Therefore, the Court proceeds under that assumption.

As in his other deliberate indifference claims, Mr. Carson has the burden to plausibly establish that the subjective element is met by showing that the Jailers knew of his substantial risk of self-harm and ignored that risk, resulting in a denial of access to medical care. Mr. Carson contends that the Jailers knew of his condition because they had access to the CCSO's records on him, they recently had several recent encounters with him, at least one of them was present when he was booked into the Jail, and they witnessed his behavior throughout his detainment. *Id*. at 27–29. Mr. Carson also argues that the Jailers ignored that risk because they did not keep records of his detainment, conduct a mental health screening at booking, attempt to secure medication for him, isolate him from the general population, or attempt to provide him access to healthcare despite his unusual behavior at the Jail. *Id*. at 29, 33–34.

Despite Mr. Carson's allegations that the Jailers knew of his condition, he does not provide sufficient facts to indicate that they knew he was at a substantial risk of self-harm when he was booked or throughout his detention. Mr. Carson's behavior may have plausibly allowed them to infer that he had a mental illness, but wearing a dog collar, pacing about, and mumbling do not indicate that a person may hurt himself. Mr. Carson argues that the Jailers knew from observing his behavior in the Jail – including kicking a door, punching a workout machine, and throwing a shower drain cover – that he posed a substantial risk of harming himself or others and they ignored that risk by not securing medical care for him or isolating him. *Id*. at 29. However, even if such behavior indicated a risk of self-harm, Mr. Carson alleges no facts to indicate that the Jailers recognized and ignored that risk. Therefore, his allegations are not enough to support his claim that the subjective element is met with respect to the Jailers, and he has not sufficiently pleaded a

plausible claim that they were deliberately indifferent to his serious medical needs. (Mr. Carson brings a separate claim against the Jailers for their actions after his suicide attempt. He brings this as part of his Conditions of Confinement claim, which the Court addresses below.)

**B. Conditions of Confinement**

Mr. Carson raises an additional claim that the Jailers held him under inadequate conditions of confinement. *Id*. at 34–35. (His claim includes Sheriff Sanchez, too, but as noted above, the Court assumes that the County Sheriff was not personally involved in Mr. Carson's detention.) A plaintiff bringing a conditions of confinement claim must satisfy a two-part test. First, he must show that the alleged injury is sufficiently serious. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). This prong requires the plaintiff to show he is incarcerated under "conditions posing a substantial risk of serious harm." *Id*. Second, the official who imposed the condition must have done so with a "sufficiently culpable state of mind." *Id*. In a prison setting, the official must be deliberately indifferent to inmate health and safety. *Id*. To be found deliberately indifferent, an official must be both aware of enough facts to draw the inference of substantial risk, and he has to draw that inference. *Redmond v. Crowther*, 882 F.3d 927, 936 n.3 (10th Cir. 2018).

Mr. Carson's alleged injury in this case is his suicide attempt. Given the implications of suicide, the Court considers the alleged injury to be sufficiently serious. Mr. Carson focuses his claim on the deliberate indifference standard which he argues is met based merely on the presence of exposed wires. ECF 28 at 12–13, *citing Ramos v. Lamm*, 639 F.2d 559, 570 (10th Cir. 1980). Mr. Carson's argument for deliberate indifference is furthered by the allegations that a Jailer put him in bed after he tried to strangle himself with the exposed wired and that the emergency buttons in his cell did not work.

However, Mr. Carson does not sufficiently establish deliberate indifference on the part of the Jailers with respect to his conditions of confinement for three reasons. First, the Tenth Circuit has not held that the presence of exposed wiring alone constitutes deliberate indifference. In *Ramos*, exposed wiring was only one aspect of a long list of the prison's unsatisfactory conditions that also included excessive mold, improper ventilation, leaking pipes, and sewage that drained into adjacent cells. *Ramos*, 639 F.2d at 569. In this case, Mr. Carson pleads no such additional, inherently dangerous conditions. Second, although, one of the Jailers put him in bed after the suicide attempt, Mr. Carson does not suggest that the exposed wires were located in his cell or otherwise posed a continued risk to his safety once he was in bed. Finally, he does not explain how the Jailers knew that his emergency buttons did not function. Because Mr. Carson has not alleged facts to establish that the Jailers knew of an ongoing substantial risk to his health and safety and exposed wires alone do not constitute deliberate indifference, he has not sufficiently pleaded a plausible claim that the Jailers violated his federally protected right to adequate conditions of confinement.

### C. Failure to Protect

Mr. Carson claims that the Defendants' failure to protect him created a substantial risk of harm to both himself and other inmates. ECF 24 at ¶¶ 176–77. In order to establish a failure to protect claim, a plaintiff must show that both an objective and subjective prong have been met. To satisfy the objective prong, he must establish that he was incarcerated under conditions that posed a substantial risk of harm, and to satisfy the subjective prong, he must show that the Defendants were deliberately indifferent to his safety. *Smith v. Cummings*, 445 F.3d 1254, 1258 (10th Cir. 2006). Deliberate indifference in this context requires a showing that the prison official knows facts from which an inference of a substantial risk of harm can be drawn and that he draws that

inference. *Verdecia v. Adams*, 327 F.3d 1171, 1175 (10th Cir. 2003). Mr. Carson focuses on the subjective prong of this test, emphasizing that the Defendants failed to protect him by not giving him immediate medical care, providing him medication, isolating him, monitoring him, or transporting him to a suitable medical facility. ECF 24 at 36.

Given that Mr. Carson was able to attempt suicide while incarcerated at the Jail, the Court considers the objective prong of the failure to protect claim satisfied. However, none of Mr. Carson's assertions for the subjective prong indicate how the Defendants would have known that he was at a substantial risk of serious harm or that they made that inference. Mr. Carson claims that the "same facts that show deliberate indifference to [his] serious medical needs and unsafe conditions of confinement" also demonstrate that the Defendants did not protect him while he was detained. ECF 28 at 13. The Court determined above, though, that Mr. Carson had not sufficiently pleaded that the Defendants were deliberately indifferent to his serious medical needs, and he does not provide additional allegations to support his claim here. Thus, the allegations he does provide are not enough for the Court to infer that the subjective prong has been met. Mr. Carson has not sufficiently pleaded a plausible claim that the Defendants were deliberately indifferent to his safety or that they failed to protect him.

## II. Section 1983 Policy or Custom Claim

Mr. Carson brings two *Monell* claims seeking to impose liability on the CCSO. First, he claims that Sheriff Sanchez, in his official capacity, made final policy decisions that directly led to his injury. ECF 24 at 39. A local government entity may be liable under § 1983 when the government's policy or custom causes a violation to a person's constitutional rights. *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 694 (1978). "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and

thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembauer v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (emphasis in original). Therefore, "a plaintiff asserting a § 1983 claim must show '1) the existence of a municipal policy or custom and 2) a direct causal link between the policy or custom and the injury alleged.'" *Mocek v. City of Albuquerque*, 813 F.3d 912, 933 (10th Cir. 2015) (quoting *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006)). Under *Pembauer*, a decision by a municipal officer only attaches liability when the decisionmaker (1) possesses final authority to establish municipal liability with respect to the action ordered and (2) is responsible for establishing such final government policy. *Pembauer*, 475 U.S. at 481–483. Additionally, for the action to be considered policy, it must be the result of a deliberate choice made to follow a course of action from among various alternatives. *Id.* at 483.

Mr. Carson argues that Sheriff Sanchez's one-time decision to book him into the Jail without conducting a medical screening, keeping intake records, or providing medical care amounted to the creation of official policy by a "final policymaker." ECF 28 at 14–15. The Court assumes, as it did above, that Sheriff Sanchez himself was not personally involved in Mr. Carson's detention. None of the remaining Defendants in the case qualifies as a final policymaker. In addition to this, the Court notes Mr. Carson's allegation that, one month before the events leading to this case, he had a mental health episode, was incarcerated at the Jail, and was then transported to the hospital. ECF 24 at ¶ 201. This action, occurring not long before the events of this lawsuit, does not support an inference that the CCSO has a custom of failing to provide proper mental healthcare for the people it arrests and detains as Mr. Carson alleges. *Id.* at ¶ 196. For these reasons, he has not sufficiently pleaded a plausible claim that the CCSO has a custom of failing to provide inmates with mental healthcare in violation of their constitutional rights.

### III. Section 1983 Failure to Train and Supervise Claim

Mr. Carson's second *Monell* claim argues that Sheriff Sanchez's failure to train and supervise his deputies resulted in inadequate treatment of mentally ill detainees, which was the moving force behind his injury. ECF 24 at 41 and ECF 28 at 17. "[T]here are limited circumstances in which an allegation of a 'failure to train' can be the basis for [municipal] liability under § 1983." *Schneider v. City of Grand Junction Police Dep't.*, 717 F.3d 760, 773 (10th Cir. 2013) (citing *City of Canton v. Harris*, 489 U.S. 378, 387 (1989)). "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to a deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton*, 489 U.S. at 388. "Only then 'can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983.'" *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *City of Canton*, 489 U.S. at 389). However, "a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training . . . is the moving force behind the plaintiff's injury." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown,* 520 U.S. 397, 407-08 (1997).

Mr. Carson argues that there is a tortious pattern of conduct at the CCSO by inadequately trained deputies because one prior inmate also attempted suicide in a separate incident. ECF 28 at 15. He further claims that the failure to train amounted to deliberate indifference based on the same allegations he used for his prior deliberate indifference claims. In short, he argues that the CCSO officials acted with deliberate indifference because they knew of his condition from their prior encounters with them and from his behavior the day he was detained. ECF 28 at 15–16.

However, one instance of a prior suicide attempt is not sufficient to establish a pattern of tortious conduct. Thus, Mr. Carson must establish that Sheriff Sanchez's failure to train amounted to deliberate indifference to his rights. To demonstrate deliberate indifference, he must show that

the failure to train amounts to a deliberate choice by the municipality to follow a course of action in training that results in a constitutional violation. *City of Canton*, 489 U.S. at 389. A failure to train claim will not be satisfied under § 1983 unless (1) the training can justifiably be said to represent the municipality's policy and (2) the lack of training is so likely to result in a violation of constitutional rights that the municipality's policymakers can be considered deliberately indifferent to a need for more or different training. *Id*. at 390. Mr. Carson, however, only alleges the same deliberate indifference claims that he already has. ECF 24 at 41–42. He therefore does not sufficiently establish that a lack of training resulted in such treatment of mentally ill detainees that his constitutional rights were violated. He also does not demonstrate that a lack of training was so likely to result in a violation of inmates' rights that relevant policymakers must be considered deliberately indifferent. Because a one-time prior event does not establish a pattern of tortious conduct, and because he does not allege facts to demonstrate deliberate indifference on the part of relevant policymakers to a need for more or different training regarding mentally ill detainees, Mr. Carson has not sufficiently pleaded a plausible claim that the municipality is liable for failing to train its employees under § 1983.

The Tenth Circuit has held that claims of failure to supervise are treated the same way as failure to train claims. *Whitewater v. Goss*, 192 F. App'x 794, 797 (10th Cir. 2006). Mr. Carson raises the same allegations in support of his failure to supervise claim that he does in his failure to train claim. Therefore, because Mr. Carson does not allege sufficient facts to suggest that Sheriff Sanchez's lack of supervision was so likely to result in a constitutional violation that it amounted to deliberate indifference, he has not sufficiently pleaded a plausible claim that the municipality is liable under § 1983 for Sheriff Sanchez's failure to supervise his deputies.

**IV. Title II of Americans With Disabilities Act Claim**

Mr. Carson claims that Sheriff Sanchez, in his official capacity, violated Title II of the ADA. To state a claim under Title II, a plaintiff must demonstrate that (1) he is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability. *Robertson v. Las Animas Cnty. Sheriff's Dep't.*, 500 F.3d 1185, 1193 (10th Cir. 2007). Mr. Carson refers to his diagnoses of schizophrenia and bipolar disorder to establish that he satisfies the first element. ECF 24 at ¶ 187. He then argues that the Defendants' failure to follow procedures and provide him access to mental health services amounts to an exclusion under the ADA, ECF 28 at 19, and he states that if not for his disability, the exclusion would not have occurred. *Id*.

The Court acknowledges that, given his diagnoses of schizophrenia and bipolar disorder, Mr. Carson satisfies the first element as a qualified individual under 42 U.S.C. § 12131 because these illnesses substantially limit at least one major life activity. 42 U.S.C. § 12102 (2009). However, he does not establish that he was excluded from services under the ADA. In the case Mr. Carson relies on for his claim, the Supreme Court said that it was plausible that the deliberate refusal to provide a basket of fundamental services constituted a denial of benefits. *United States v. Georgia*, 546 U.S. 151, 157 (2006). Medical care was included as part of that basket, but the Supreme Court does not indicate that medical care alone qualifies as an exclusion. Yet, that is the only service that Mr. Carson alleges he did not receive in a timely manner. Despite his assertion, Mr. Carson received mental health treatment the next day. ECF 24 at ¶ 151. Because Mr. Carson does not sufficiently establish that he was excluded from benefits at the Jail because of his

disability, the Court cannot plausibly infer that Sheriff Sanchez, in his official capacity, excluded him from benefits in violation of Title II of the ADA.

Mr. Carson also contends that the Defendants' failure to accommodate his disability was rooted in Sheriff Sanchez's failure to train or supervise his deputies as required by the ADA. He argues that his claim is supported by Sheriff Sanchez's failure to require appropriate training on how to intake persons with disabilities. ECF 28 at 20. However, though it has not foreclosed the possibility, the Tenth Circuit has not recognized a failure to train claim of discrimination under the ADA. *J.V. v. Albuquerque Pub. Schs.*, 813 F.3d 1289, 1297 (10th Cir. 2016). In this case, Mr. Carson has not sufficiently pleaded that an ADA violation occurred. Therefore, his claim of an ADA failure to train has no basis, and the Court cannot plausibly infer that Sheriff Sanchez, in his official capacity, is liable for failing to train or supervise his deputies as required by the ADA.

## V. Qualified Immunity

Each Defendant seeks dismissal of Mr. Carson's individual § 1983 claims based on qualified immunity. Qualified immunity protects a public official from litigation when his possible breach of a plaintiff's civil rights was not clearly a violation at the time of the official's actions. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It is an entitlement not to stand trial or face the other burdens of litigation. *Ahmad v. Furlong*, 435 F.3d 1196, 1198 (10th Cir. 2006) (internal quotations and citations omitted). The privilege is an immunity from suit rather than a mere defense to liability. *Id.* The defense of qualified immunity requires that "(1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Est. of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1169 (10th Cir. 2020). The Supreme Court in *Pearson v. Callahan* emphasized that courts have the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in

light of the circumstances in the particular case at hand." 555 U.S. 223, 236 (2009); *see also*

*Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1277 (10th Cir. 2009).

In this case, each Defendant asserts that Mr. Carson fails to state a claim for deliberate

indifference. They contend that his allegations do not demonstrate that any Defendant had both

actual knowledge of an excessive risk to his serious medical need and that they disregarded that

risk. ECF 18 at 7. As discussed above, this Court finds that Mr. Carson does not plead a plausible

constitutional violation against any of the Defendants. However, because the Court gives him leave

to amend his complaint, the potential that he may be able to do so renders the qualified immunity

analysis premature. Likewise, the Court waits to consider whether the law is clearly established

until his new theories of relief are before it.

## **LEAVE TO AMEND**

Dismissal of a case is a harsh remedy, and as a general rule, a litigant should have the

opportunity to amend the complaint and cure pleading defects. *Hall v. Bellmon*, 935 F.2d 1106,

1109–10 (10th Cir. 1991); *Reynoldson v. Shillinger*, 907 F.2d 124, 126 (10th Cir. 1990). The Court

does not find that filing a Third Amended Complaint would be futile. This is the first ruling on the

merits of Defendants' dismissal arguments, and there is the potential that Mr. Carson can correct

for at least some of the pleading deficiencies discussed above.

## **CONCLUSION**

For the reasons stated herein, the Court respectfully recommends[1] **granting** the

Defendants' Motions to Dismiss [underline]filed November 1, 2021; ECF 18 and March 8, 2022; ECF 26[/underline].

---

[1] Be advised that all parties shall have fourteen (14) days after service hereof to serve and file any
written objections in order to obtain reconsideration by the District Judge to whom this case is
assigned. Fed. R. Civ. P. 72. The party filing objections must specifically identify those findings
or recommendations to which the objections are being made. The District Court need not consider
frivolous, conclusive or general objections. A party's failure to file such written objections to

The Motions should be granted as to all claims pursuant to Fed. R. Civ. P. 12(b)(6) but without prejudice to file a Third Amended Complaint. Mr. Carson also shall consider whether to keep Deputy Esquibel as a Defendant and how he will plead Sheriff Sanchez's personal, direct involvement with his booking and detention.

Entered this 26th day of April, 2022, at Denver, Colorado.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge

---

proposed findings and recommendations contained in this report may bar the party from a *de novo* determination by the District Judge of the proposed findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1). Additionally, the failure to file written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy may bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted or adopted by the District Court. *Duffield v. Jackson*, 545 F.3d 1234, 1237 (10th Cir. 2008) (quoting *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991)).